IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION



**FILED**

P.M. _October 28_ 20 08
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
By_____
DEPUTY

| | | |
|---|---|---|
| ARIBA, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 9:07-CV-90 |
| v. | § | |
| | § | |
| EMPTORIS, INC., | § | JUDGE RON CLARK |
| | § | |
| *Defendant* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## JURY INSTRUCTIONS

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you, the jury, are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

It is my duty as Judge to explain what some of the words used in the patent claims mean. Attached as Appendix A to this charge are the claim terms I have defined for you. These are the same definitions found in your juror notebook. You must accept as correct the definitions contained in Appendix A.

The claim language of the patent I have not defined for you in Appendix A is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the art, in the context of the patent specifications and prosecution history.

A person of **"ordinary skill in the art"** covered by the patents-in-suit is someone with the equivalent of a "four year" degree from an accredited institution (usually denoted in this country as a B.S. degree) in computer science or a field of study involving programming and using computers, and two years of experience researching, designing, developing or implementing computer programs that involve e-commerce. He or she should be familiar with auction theory and electronic auctions. Extensive experience and technical training might substitute for educational requirements, while advanced education might substitute for experience.

When words are used in these instructions and in the definitions in Appendix A in a sense that varies from the meaning commonly understood, you are given a

2

proper legal definition, which you are bound to accept in place of any other meaning. The other words in these instructions, and in the definitions I have provided to you, have the meaning commonly understood.

Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

## I. What is and What is not Evidence

You will be instructed to answer some questions based upon a **"preponderance of the evidence."** This means you must be persuaded by the evidence that the claim is more probably true than not true. You will be instructed to answer other questions by **"clear and convincing evidence."** This is a higher burden than by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. Clear and convincing evidence is evidence that shows something is highly probable. In deciding whether any fact has been proved in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them, and the facts to which the parties have stipulated. Attached as Appendix B is a list of facts to which the parties have stipulated. This is the same set of facts that is included in your jury book.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important factor or with only an unimportant detail.

In making up your mind and reaching your verdict, do not make your decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point. The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

4

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case.  One is direct evidence – such as testimony of an eyewitness or stipulation.  The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.  As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

During the trial, I sustained objections to certain questions. You must disregard those questions entirely.  Do not speculate as to what the witness would have said if permitted to answer the question.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instruction to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

If you have taken notes they are to be used only as aids to your memory, and if your memory should be different from your notes, you should rely on your memory and not on your notes. If you did not take notes, rely on your own independent memory of the testimony. Do not be unduly influenced by the notes of other jurors. A juror's notes are not entitled to any greater weight than the recollection of each juror concerning the testimony.

If scientific, technical, or other specialized knowledge may be helpful to the jury, a witness with special training or experience may testify and state an opinion concerning such matters. However, you are not required to accept that opinion. You should judge such testimony like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

In deciding whether to accept or rely upon the opinion of such a witness, you may consider any bias of the witness, including any bias you may infer from evidence that the witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly.

## II.  The Nature of the Action, the Parties, and the Contentions

Patents are issued by the United States Patent and Trademark Office, which is part of our government.  The government is authorized by the United States Constitution to enact patent laws and issue patents to protect inventions. Inventions that are protected by patents may be of products, compositions, or of methods for doing something, or for using or making a product or composition. The owner of a patent has the right, for the life of the patent, to prevent others from making, using, offering for sale, or selling the invention covered by the patent.

It has been determined that Defendant Emptoris, Inc. infringes claims 69 and 82 of the '114 patent. Ariba, Inc. contends that Emptoris also infringes claims 16, 17, 18, 20, 21, and 22 of the '018 patent by making, using, offering to sell, or selling within the United States the Emptoris software.  Each claim of a patent is a separate invention.  Ariba also asserts that the infringement of both the '114 and the '018 patents is willful.

Emptoris denies that it is infringing claims 16, 17, 18, 20, 21, and 22 of the '018 patent.  Emptoris also contends that the asserted claims of both the '114 and '018 patents are invalid.  Invalidity is a defense to infringement.  Therefore, even though the PTO Examiner has allowed the claims of the patent, you, the jury, have the responsibility for deciding whether the claims of the patent are valid.  Further,

7

Emptoris contends that Ariba delayed unreasonably and inexcusably in asserting Ariba's claim that the '018 patent had been infringed and that this delay prejudiced Emptoris. Emptoris denies that Ariba is entitled to any damages.

## III. Claims and Claim Interpretation

To decide the questions of infringement and invalidity, you must first understand what the claims of the patent cover, that is, what they prevent anyone else from doing. This is called "claim interpretation." You must use the same claim interpretation for both your decision on infringement and your decision on invalidity. I instructed you earlier on the definitions you must use in interpreting claims.

The patent claims are numbered sentences at the end of the '114 and '018 patents. Each claim describes a separate invention. The claims are divided into parts called "limitations." These limitations also may be referred to as "elements." The claims are "word pictures" intended to define, in words, the boundaries of the inventions. Only the claims of a patent can be infringed. Neither the written description, sometimes called the specification, nor the drawings of a patent can be infringed. Each of the claims must be considered individually.

In this case, there are eight claims, namely claims 69 and 82 of the '114 patent and claims 16, 17, 18, 20, 21, and 22 of the '018 patent. All eight of these

claims are "system" claims. A system claim describes a physical entity, which may be referred to as an apparatus or a product.

Patent claims may exist in two forms, referred to as independent claims and dependent claims. An independent claim does not refer to any other claim of the patent. Thus it is not necessary to look at any other claim to determine what an independent claim covers. Claims 69 and 82 of the '114 patent and claim 16 of the '018 patent are independent claims. Claims 17, 18, 20, 21, and 22 are dependent claims.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the limitations of the other claim or claims to which it refers, as well as the additional limitations recited in the dependent claim itself. Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers.

## IV. Infringement

It has been determined that Emptoris infringes claims 69 and 82 of the '114 patent. To prevail on the '018 patent, Ariba must establish infringement of one or more claims of the patent. To prove "infringement" of a claim, Ariba must prove by a preponderance of the evidence that, during the time the '018 patent is in force, Emptoris has made, used, offered to sell or sold within the United States software

9

that incorporates all of the elements of that claim and has done so without the permission of the patent holder.

You must compare each of the asserted Emptoris' software products with each of the '018 patent claims Ariba asserts is infringed. You must then determine whether Ariba has proved, by a preponderance of the evidence, that each element of that claim is present in that software product. You may not consider whether or not other software not accused of infringement by Ariba may infringe one or more of the asserted claims.

Someone can infringe a patent without knowing that what they are doing is an infringement of the patent. They also may infringe even though they believe in good faith that what they are doing is not an infringement of any patent. On the other hand, someone does not infringe by inventing a new and different way of accomplishing the same result - that is, to create software that does not incorporate all of the limitations of any claim of the patent.

Claims 17, 18, 20, and 21 of the '018 patent use the words **"comprise"** or **"comprised."** These terms mean "including the following but not excluding others." Comprising claims are open-ended. Therefore, if you find that an accused system includes all of the elements of such a claim, the fact that the system might include additional features, functions, or elements would not avoid infringement

10

of that claim.   For example, if the '018 patent contains sub-elements A, B, and C, and an accused Emptoris product contains sub-elements A, B, C, and D, infringement is avoided only if the '018 patent excludes the possibility of element D.

Keep in mind that merely because an accused product can be used in a way that does not infringe, does not mean that it is a non-infringing product.  However, it is necessary that you find by a preponderance of the evidence that each and every element of one or more of the asserted claims is present in that accused software product.

## V. Willfulness

In this case, Ariba argues both that Emptoris infringed and that Emptoris infringed willfully.  So, as you will see on the verdict form, you will first consider each claim of the '018 patent and decide whether it is more likely than not that it is infringed.   For each claim of the '114 patent and for each claim of the '018 patent you find infringed, you must then decide whether Ariba has shown by clear and convincing evidence that:

(1)   Emptoris was aware of the patent containing the claim or claims you find infringed and

(2)   Emptoris engaged in the accused infringing activities recklessly and without a reasonable basis for believing that its software products did

not infringe the patent containing the claim or claims. Specifically, Ariba must show that Emptoris acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, and that this objectively defined risk was either known or so obvious that it should have been known to Emptoris. The state of mind of Emptoris is not relevant to this objective standard.

In deciding whether Emptoris committed willful infringement, you must consider all of the facts, which include but are not limited to:

(1)     Whether Emptoris intentionally copied software covered by the claim or claims you found to be infringed;

(2)     Whether Emptoris, when it learned of Ariba's patent protection, investigated the scope of the '114 and '018 patents and formed a good faith belief that the patents were not infringed, before Emptoris started or continued any possible infringing activity;

(3)     Whether Emptoris had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

(4)     Whether Emptoris made a good faith effort to avoid infringing the patents, for example, that Emptoris took remedial action upon learning of the patents by ceasing infringing activity or attempting to design around the patents; and

(5)     Whether Emptoris tried to cover up its infringement.

The facts that the '114 patent has been determined to be infringed, or that you may have found that the '018 patent is infringed, does not mean that Emptoris' infringement was willful. All that is required to avoid a finding of willful

12

infringement is that Emptoris had a good faith belief that it did not infringe, and that its belief was reasonable under all of the circumstances.

The issue of willful infringement is not relevant to your decision of whether there is infringement.   A finding of willful infringement may, in certain circumstances, result in the court awarding the patent owner increased damages. If you decide that Emptoris willfully infringed either the '114 or '018 patent, then it will be the Court's job to decide whether or not to award increased damages to Ariba.   You should not consider willful infringement in making your damage award, if any.

## VI. Invalidity

Only a valid patent may be infringed.   A patent cannot take away from people their right to use what was known or what would have been obvious when the invention was made.   Therefore, you the jury have the responsibility for deciding whether each claim in question is valid.

For a patent to be valid, the invention claimed in the patent must be new and non-obvious in light of what came before.   That which came before is referred to as the "prior art."   You are instructed that the effective date of invention for the patents-in-suit is September 18, 1998.   Emptoris contends that claims 69 and 82 of

the '114 patent and claims 16, 17, 18, 20, 21, and 22 of the '018 patent are not valid. Emptoris must prove invalidity by clear and convincing evidence.

Emptoris is relying on various items of prior art. Emptoris and Ariba agree that the following items are prior art, and there is no dispute that these items came before the invention claimed in the '114 and '018 patents:

(1)   ~~U.S. Patent No. 5,862,244 to Huberman (DX 4)~~

(2)   Article by Dyer and Kagel entitled "Bidding in Common Value Auctions" (DX 30)

(3)   Kern County Ordinance (DX 46)

(4)   FCC Auctions ("Second Report and Order") (DX 61)

(5)   GE Auctions (1994-1996)

(6)   U.S. Patent No. 6,023,685 to Brett (DX 6)

(7)   Article entitled "Auctions and Bidding" by McAfee and McMillan (DX 20)

(8)   Article entitled "The Michigan Auction Bot" by Wurman, Wellman and Walsh (DX 38)

**Obviousness**

Emptoris contends that claims 69 and 82 of the '114 patent and claims 16, 17, 18, 20, 21, and 22 of the '018 patent are invalid because the claimed subject matter of each of these claims was obvious to one of ordinary skill in the art at the time the invention was made. To be patentable, an invention must not have been

obvious to a person of ordinary skill in the pertinent art at the time the invention was made.

Obviousness may be shown by considering more than one item of prior art in combination with each other. Emptoris contends that these claims would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made in light of one or more of the following combinations of references:

For the '114 Patent:

(1)   U.S. Patent No. 5,862,244 to Huberman (DX 4) and the Article by Dyer and Kagel entitled "Bidding in Common Value Auctions" (DX 30); or

(2)   U.S. Patent No. 5,862,244 to Huberman (DX 4) and the Kern County Ordinance (DX 46); or

(3)   FCC Auctions ("Second Report and Order") (DX 61) and the Article by Dyer and Kagel entitled "Bidding in Common Value Auctions" (DX 30); or

(4)   FCC Auctions ("Second Report and Order") (DX 61) and the Kern County Ordinance (DX 46); or

(5)   GE Auctions (1994-1996) and the Article by Dyer and Kagel entitled "Bidding in Common Value Auctions" (DX 30); or

(6)   GE Auctions (1994-1996) and the Kern County Ordinance (DX 46);

For the '018 Patent:

(1)     U.S. Patent No. 6,023,685 to Brett (DX 6) and the article entitled "Auctions and Bidding" by McAfee and McMillan (DX 20); or

(2)     GE Auctions (1994-1996) and the article entitled "The Michigan Auction Bot" by Wurman, Wellman and Walsh (DX 38).

You must consider each combination separately.

The next question is, would it have been obvious to those skilled in the art who knew of these references in that combination to make the invention described in a claim? If the answer to that question is "yes", then that patent claim is invalid. Emptoris has the burden of proving by clear and convincing evidence that claims 69 and 82 of the '114 patent and claims 16, 17, 18, 20, 21, and 22 of the '018 patent are invalid for obviousness.

Obviousness is determined from the perspective of a person of ordinary skill in the field of the invention. The issue is not whether the claimed invention would have been obvious to you, to me as a Judge, or to a genius in the field of the invention. Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the field of the invention.

You must not use hindsight when comparing the prior art to the invention for obviousness. In making a determination of obviousness or non-obviousness, you

must consider only what was known before September 18, 1998. You may not judge the invention in light of present day knowledge.

In determining whether or not these claims would have been obvious, you should make the following determinations from the perspective of a person of ordinary skill in the art, as I have previously defined it for you, in light of the scope and content of the prior art:

First, are there any **material differences** between the **scope and content** of the prior art and each asserted claim of the '114 and '018 patents?

Second, are there any **objective indications** of non-obviousness?

**a. Scope and Content**

Determining the scope and content of the prior art means that you should determine what is disclosed by each combination of references you have found to be prior art. You must decide whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims. Such relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

### b. Material Difference

In determining whether there are any material differences between the invention covered by the patent claims and the prior art, you should not look at the individual differences in isolation. You must consider the claimed invention as a whole and determine whether or not it would have been obvious in light of the prior art.

If you conclude that the prior art discloses all the elements of the claimed invention, you may consider whether or not it would have been obvious to combine those items. A claim is not obvious merely because all of the elements of that claim already existed.

In deciding whether to combine what is described in various items of prior art, you should consider whether or not there was some motivation or suggestion for a skilled person to make the combination covered by the patent claims. You should also consider whether or not someone reading the prior art would have been discouraged from following the path taken by the inventor.

It is common sense that familiar items may have been obvious beyond their primary purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents together likes pieces of a puzzle. Multiple references in the prior art can be combined to show that a claim is obvious. Any need or

problem known in the field and addressed by the patent can provide a reason for combining the elements in the manner claimed. To determine whether there was an apparent reason to combine the known elements in the way a patent claims, you can look to interrelated teachings of multiple patents, to the effects of demands known to the community or present in the marketplace, and to the background knowledge possessed by a person of ordinary skill in the art. Neither the particular motivation of the person of ordinary skill in the art nor the alleged purpose of the patentee controls. One of ordinary skill in the art is not confined only to prior art that attempts to solve the same problem as the patent claim.

### c. Objective Indications

You also must consider what are referred to as objective indications of non-obviousness. Some of these indications of non-obviousness are:

(1)    Long-felt and unmet need in the art for the invention;

(2)    Failure of others to achieve the results of the invention;

(3)    Commercial success of the invention;

(4)    Praise of the invention by those in the field;

(5)    Expression of disbelief or skepticism by those skilled in the art;

(6)    Invention proceeded in a direction contrary to accepted wisdom in the field; and

(7)    Invention achieved any unexpected results.

These objective indications are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims. For example, commercial success is relevant to obviousness only if the success of the system is related to a feature of the patent claims. If the commercial success is the result of something else, such as innovative marketing, and not to a patented feature, then you should not consider it to be an indication of non-obviousness.

Again, you must compare separately each of the claims of the patents asserted by Ariba with each combination of references to determine whether Emptoris has proved by clear and convincing evidence that one or more of the claims was obvious.

## VII. Damages

If you find by a preponderance of evidence that a claim has been infringed and you do not find by clear and convincing evidence that the same claim is invalid, then Ariba is entitled to an award of damages adequate to compensate for the infringement. You should not interpret the fact that I have given instructions about damages as an indication in any way that I believe that Ariba should, or should not, win this case. It is your task first to decide whether Emptoris is liable. I am instructing you on damages only so that you will have guidance in the event

you decide that Emptoris is liable and that Ariba is entitled to recover money from Emptoris.

You may award Ariba damages for any infringement you have found. The amount of those damages must be adequate to compensate Ariba for the infringement. Your damages award, if you reach this issue, should put the patent holder in approximately the same financial position that it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. You may not add anything to the amount or damages to punish Emptoris or to set an example.

Ariba has the burden to establish the amount of its damages by a preponderance of the evidence. Damages are limited to acts of infringement in the United States. You should award only those damages that Ariba establishes that it more likely than not suffered. Ariba is not entitled to damages that are remote or speculative or based on guesswork. While Ariba is not required to prove their damages with mathematical precision, they must prove them with reasonable certainty.

Damages may be awarded using two ways, lost profits of Emptoris' sales, and as a reasonable royalty on Emptoris's sales.

**Lost Profits**

To recover lost profits for infringing sales, Ariba must show that, but for the infringement, there is a reasonable probability that they would have made sales that Emptoris made of the infringing software.  In proving that they would have made those sales if not for the infringement, Ariba must establish the share of Emptoris' sales that they would have made had the infringing software not been on the market.

Ariba is entitled to lost profits if they establish each of the following, by a preponderance of the evidence:

(1)    that there was a demand for the patented system;

(2)    that there were no non-infringing substitutes or, if there were, Ariba's **market share** of the number of the sales made by Emptoris that Ariba would have made despite the availability of other acceptable non-infringing substitutes.  An alternative may be considered available as a potential substitute even if it was not actually on sale during the infringement period.  Factors suggesting that the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available.  Factors suggesting that the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether Emptoris had to design or invent around the patented technology to develop an alleged substitute;

(3)    that Ariba had the manufacturing and marketing capacity to make any infringing sales actually made by the infringer and for which Ariba seeks an award of lost profits; and

(4)    the amount of profit that Ariba would have made if Emptoris had not infringed.

**"Market Share"** - If you find that Ariba established that it would have made sales but for the infringement, you must decide the amount of sales that Ariba lost as a result of the infringement. One way it may prove the sales they would have made if the infringement had not happened is to prove its share of the relevant market, excluding infringing software. You may award Ariba a share of the profits equal to that market share even if you find that there were available, non-infringing substitutes for the patented system.

In deciding Ariba's market share, you must decide which software products are in its market. Products are in the same market if they are sufficiently similar to compete against each other. Two products are sufficiently similar if one does not have a significantly higher price or that possesses characteristics significantly different than the other.

**Reasonable Royalty**

If you find that Ariba has established infringement, it is entitled to at least a reasonable royalty to compensate for that infringement. If you find that Ariba has not proved its claim of lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award Ariba a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

A royalty is the amount of money a licensee pays to a patent owner for use made of the invention under the patent. A reasonable royalty is the amount of money a willing patent owner and a willing prospective licensee would have agreed upon at the time of the infringement for a license to make use of the invention. It is the royalty that would have resulted from an arm's-length negotiation between a willing licensor and a willing licensee, assuming that both parties believed the claims in question to be valid and infringed and that the licensee would respect the patent. In making your determination of the amount of a reasonable royalty, it is important that you focus on the time period when the infringer first infringed the patent and the facts that existed at that time. Your determination does not depend on the actual willingness of the parties to this lawsuit to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered negotiations at the time the infringing activity began and the facts that existed at the time.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1)    whether the patent holder had an established royalty for the invention; in the absence of such a licensing history, any royalty arrangements that were generally used and recognized in the particular industry at that time. In this connection, when evaluating evidence about amounts paid under other licenses and agreements, you should consider whether such licenses and to what extent the license was

comparable -- that is, was the technology exchanged and the terms of the agreement similar in terms and scope to the technology of the patent-in-suit and the bare license for the patent in the hypothetical negotiation;

(2)   the nature of the commercial relationship between the patent owner and the licensee such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

(3)   the established profitability of the patented method or system, its commercial success and its popularity at the time;

(4)   whether the patent owner had an established policy of granting licenses or retaining the patented invention as its exclusive right, or whether the patent holder had a policy of granting licenses under special conditions designed to preserve its exclusivity;

(5)   the size of the anticipated market for the invention at the time the infringement began;

(6)   the duration of the patent and of the license, as well as the terms and scope of the license, such as whether it is exclusive or nonexclusive or subject to territorial restrictions;

(7)   the rates paid by the licensee for the use of other patents comparable to the plaintiff's patent;

(8)   whether the licensee's sales of the patented invention promote sales of its other methods or systems and whether the invention generates sales to the inventor of his nonpatented items;

(9)   the utility and advantages of the patent property over the old methods or systems, if any, that had been used for working out similar results;

(10)   the extent to which the infringer used the invention, and any evidence probative of the value of such use;

25

(11)   the portion of the profits in the particular business that are customarily attributable to the use of the invention or analogous inventions;

(12)   the portion of the profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks or significant features or improvements added by the infringer;

(13)   the opinion and testimony of qualified experts and of the patent holder;

(14)   any other factors which, in your mind, would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people;

(15)   the amount that a licensor and a licensee would have agreed upon just before the patent-in-suit was issued if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to use a particular system or method embodying the patented invention would have been willing to pay as a royalty and still be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors. The final factor establishes the framework which you should use in determining a reasonable royalty, i.e., the payment that would have resulted from a negotiation between Ariba and Emptoris taking place at the time when the infringing sales first began.

**Marking**

Ariba has the burden to prove by a preponderance of the evidence that they gave notice of the '114 and '018 patents.  Ariba can do this by placing the word "patent" or the abbreviation "PAT" along with the number 6,216,114 or 6,499,018 on substantially all the software it sold that included the patented invention.  This type of notice is effective from the date Ariba began to mark substantially all of its software that uses the patented invention with the patent number.  If Ariba did not mark substantially all of its software that used the patented invention with the patent number, from the time it commenced marking then Ariba did not provide notice.

**Laches**

Emptoris contends that Ariba delayed inexcusably and unreasonably in filing of lawsuit asserting infringement of the '018 patent.  The owner of a patent may be entitled to recover damages against an alleged infringer only for acts that occurred after it filed a lawsuit where:

(1)    the patent holder delayed filing the lawsuit for an unreasonably long period of time;

(2)    there was no excuse for the patent holder's delay in filing the lawsuit; and

27

(3)     the allegedly infringing party has been or will be prejudiced in a significant way due to the patent holder's delay in filing the lawsuit.

This is referred to as laches. Only the period of time after the '018 patent issued may be considered. The '018 patent issued on December 24, 2002.

Whether Ariba's delay was unreasonably long is a question that must be answered by considering the facts and circumstances as they existed during the period of delay in the way that reasonably prudent business people would have viewed them. There is no set list of acceptable or unacceptable justifications for an otherwise unreasonable delay in bringing a law suit. For example, evidence of the following might serve as a justification or excuse for any delay in the filing of this lawsuit:

(1)     Being involved in other litigation during the period of delay;

(2)     Being involved in negotiations over infringement with the allegedly infringing party during the period of delay;

(3)     Being involved in a dispute about ownership of the patent during the period of delay; or

(4)     Minimal amounts of allegedly infringing activity by the allegedly infringing party during the period of delay.

Any particular justification or excuse offered by Ariba in this case must be evaluated in light of the facts and circumstances that existed during the period of delay in this case.

Prejudice to Emptoris as a result of any delay by Ariba in filing this lawsuit can be economic or evidentiary in nature. Whether Emptoris suffered evidentiary prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing this case resulted in Emptoris not being able to present a full and fair defense on the merits to Ariba's infringement claim. Not being able to present a full and fair defense on the merits to an infringement claim can occur due to the loss of important records, the death or impairment of an important witness, the unreliability of memories about important events because they occurred in the distant past, or other similar types of things.

Whether Emptoris suffered economic prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing suit as to the '018 patent resulted in Emptoris changing its economic position in a significant way during the period of delay, and also whether Emptoris' losses as a result of that change in economic position could have been avoided if Ariba had filed a lawsuit sooner. Having to pay damages to Ariba if Emptoris is found to infringe on its patent does not amount to economic prejudice by itself; rather, Emptoris' liability for infringement damages or the other economic losses that may be incurred by

Emptoris if found to be an infringer must have been avoidable if Ariba had filed this lawsuit sooner.

# VIII.  Instructions for Deliberations

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong.  However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges—judges of the facts. Your only interest is to the seek the truth from the evidence in the case.

Do not let bias, prejudice or sympathy play any part in your deliberations. This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth and holding the same or similar stations in life.  A corporation is entitled to the same fair trial at your hands as a private individual and should be treated as such.  The law is no respecter of persons; all persons, including corporations and other organizations, stand equal before the law, and are to be dealt with as equals in a court of justice.

When you retire to the jury room to deliberate on your verdict, you will take this charge with you as well as exhibits which the Court has admitted into evidence. When you go to the jury room, the first thing that you should do is select

one of your number as your Foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The Foreperson should read, or have another juror read, these instructions to the jury. You should then begin your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you on your conduct during the trial. Do not discuss the case unless all jurors are present in the jury room. After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and initial and date the verdict form. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question. If you want to communicate with me at any time, please give a written message or question to the court security officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.

The presiding juror or any other juror who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.  You may now retire to the jury room to conduct your deliberations.

SIGNED October 28, 2008.

Judge Ron Clark
United States District Judge

# APPENDIX A: Claim Definitions

| TERM | DEFINITION |
|---|---|
| **Bid**<br>'114 patent, claims 69, 82<br>'018 patent, claim 16 | the terms, on which a seller offers to provide something requested by a buyer or on which a buyer offers to acquire something from a seller |
| **Bid message**<br>'018 patent claim 16 | a message about a bid |
| **Buyer defined lot**<br>'018 patent, claim 20 | a lot whose contents have been identified in whole or part by the buyer |
| **Closing time**<br>'114 patent, claims 69, 82 | the time that the bidding is scheduled to end |
| **Computer readable medium / machine readable medium / computer usable medium**<br>'114 patent, claims 69, 82<br>'018 patent, claims 16, 17, 18, 20, 21, 22 | material from which data can be read by a computer |
| **Downward auction**<br>'018 patent, claim 16 | an auction in which bidding drives prices down, rather than up |
| **Electronic auction**<br>'114 patent, claims 69, 82<br>'018 patent, claim 16 | an auction managed with a computer software application that enables invited bidders to submit bids via an electronic communication network and an auction coordinator to receive and act upon the bids. |
| **First time interval**<br>'114 patent, claims 69, 82 | a predetermined time period during which a bid can trigger overtime |
| **Individual bid ceiling**<br>'018 patent, claims: 16, 17, 18, 21 | the upper limit of a bid that will be accepted from a particular bidder |

| TERM | DEFINITION |
|---|---|
| **Invalid bid message**<br>    '018 patent, claim 22 | a communication indicating in some way that an offered bid is unacceptable |
| **Lot**<br>    '114 patent, claims 69, 82<br>    '018 patent, claim 21 | one or more items grouped for bidding |
| **Overtime**<br>    '114 patent, claims 69, 82 | a period of extra time bidding |
| **Overtime condition**<br>    '114 patent, claims 69, 82 | a property of a bid that triggers overtime |
| **Previous offline bid**<br>    '018 patent, claim 18 | a bid placed before the start of the electronic auction |
| **Price discovery prior to the start of the auction**<br>    '018 patent, claim 17 | information received from a seller prior to the start of the electronic auction that relates to the price to be paid by that particular seller |
| **Second time interval**<br>    '114 patent, claim 69, 82 | time interval by which a scheduled closing time, whether an initially-scheduled time or an extended time, is extended |

# Appendix B: Stipulated Facts

The parties have agreed, or stipulated, to the following facts. This means that both sides agree these are facts. You must therefore treat these facts as having been proved.

1.     The earliest of the two provisional applications that matured into the '114 and '018 Patents was filed with the United States Patent and Trademark Office on September 18, 1998. The second provisional application was filed on December 4, 1998.

2.     The application for the '114 Patent was filed with the United States Patent and Trademark Office on May 14, 1999.

3.     The inventors named on the '114 Patent are Marc Alaia, David Becker, Anthony Bernard, Daniel Heckmann, Sam E. Kinney, Glen T. Meakem, Vincent F. Rago, Jason Reneau, Frederick W. Roberts, William D. Rupp, and Robert G. Stevens.

4.     The United States Patent and Trademark Office issued the '114 Patent on April 10, 2001.

5.     A Certificate of Correction for the '114 Patent was issued on February 10, 2004.

6.     Ariba is the owner by valid assignment of all rights, title, and interest in the '114 Patent.

7.     The application for the '018 Patent was filed with the United States Patent and Trademark Office on May 14, 1999.

8.     The inventors named on the '018 Patent are Marc Alaia, David J. Becker, Sam E. Kinney, Jr., Vincent F. Rago, and William D. Rupp.

9.     The United States Patent and Trademark Office issued the '018 Patent on December 24, 2002.

10.     Ariba is the owner by valid assignment of all rights, title, and interest in the '018 Patent.

11.     FreeMarkets owned the '018 and '114 patents before FreeMarkets was acquired by Ariba in July 2004.

12.     All of the Accused Products contain auction functionality.

13.     The first Emptoris software product with auction functionality was ePass 3.1, which was released in August 2001. Emptoris released ePass 3.4 during the first quarter of 2002. Emptoris commercially released the Emptoris 5.2 software product in November 2005, the Emptoris 6.1 software product in December 2006, and the Emptoris 7.0 software product on or about April 2008.

14.     Emptoris has developed the Accused Products in Burlington, Massachusetts and Pune, India. The software code developed in India is compiled for the final release of a product in Massachusetts. In Massachusetts, the source code for the Accused Products is also developed, compiled into a "build" that is tested, and then installed onto Emptoris' hosting environment.

15.     Emptoris licenses the use of the Accused Products to its customers, both when the software is run in a hosted environment and when it is provided to Emptoris' customers to run behind their own corporate firewalls.

16.     The Accused Products are made in the United States.

17.     The Accused Products are sold in the United States.